FILED
COURT OF APPEALS
DIVISION II

2014 MAY 13 AM 9: 14

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

FA ALA A SAILI and LISA A. SAILI,
husband and wife,

                    Respondents,

    v.

PARKLAND AUTO CENTER, INC.,

                    Appellant.

No. 44209-4-II

PART PUBLISHED OPINION

MAXA, J. – Parkland Auto Center Inc. appeals the trial court's denial of its motion to compel arbitration of claims asserted by Lisa and Fa Ala A Saili, arising from Parkland's repossession of their vehicle. Parkland also appeals the trial court's grant of the Sailis' summary judgment motion on liability, denial of motions for reconsideration, judgment awarding damages to the Sailis, and order awarding attorney fees to the Sailis.

We hold that the trial court did not err when it denied Parkland's motion to compel arbitration because Parkland waived its right to enforce the sale contract's arbitration clauses by not referencing the arbitration clauses in its answer, engaging in discovery, and waiting until after the Sailis filed a summary judgment motion to assert the right to arbitration. We address the remaining issues in the unpublished portion of this opinion. We affirm.

## FACTS

Lisa Saili signed a retail installment sale contract to purchase a 2003 GMC Sonoma from Parkland. The parties executed three additional agreements: a "Condition of Financing," a "Vehicle Buyers Order" and a "Supplemental Disclosure and Agreement." Saili made a $500 down payment on the Sonoma and signed a $500 promissory note for the remainder of the down payment, to be paid by May 18, 2011. As additional collateral for the purchase of the Sonoma, Saili agreed to give Parkland a security interest in a 2002 Chevrolet Suburban that she owned with her husband.

Saili tendered a check to Parkland for the $500 promissory note, but after discovering that her financing application was denied she withdrew the funds she held on deposit for that payment. When Parkland cashed the check it was dishonored for insufficient funds. As a result, on May 31, Parkland had the Sonoma and the Suburban towed from the Sailis' residence to Parkland's place of business.

On June 10, the Sailis filed a complaint against Parkland seeking damages and an order requiring Parkland to return the Suburban. Parkland answered, and the parties proceeded with litigation. Both the Vehicle Buyers Order and the Supplemental Disclosure and Agreement contained clauses requiring the parties to arbitrate all disputes regarding the sale. However, Parkland did not reference these clauses in its answer or seek to enforce them as litigation progressed.

On December 20, the Sailis moved for summary judgment on liability. On January 5, 2012 – almost seven months after the Sailis filed their complaint and three weeks after the Sailis filed their summary judgment motion – Parkland sent the Sailis a letter requesting arbitration.

No. 44209-4-II

On January 20, Parkland moved for an order staying proceedings and compelling arbitration. The trial court denied Parkland's motion. Parkland appeals this denial.

ANALYSIS

Parkland argues that the trial court erred in denying its motion to compel arbitration based on arbitration clauses contained in two documents Saili signed: the Vehicle Buyers Order and the Supplemental Disclosure and Agreement. The Sailis argue that the clauses were unenforceable because the retail installment sale contract did not contain an arbitration clause and the clauses in these other documents were unconscionable, and that Parkland waived its right to arbitration. We hold that even if the clauses were enforceable, Parkland waived the right to compel arbitration.

1. Legal Principles

We review a trial court's order denying a motion to compel arbitration de novo.[1] *Otis Hous. Ass'n, Inc. v. Ha*, 165 Wn.2d 582, 586, 201 P.3d 309 (2009). The party opposing arbitration bears the burden of showing the arbitration clause is inapplicable or unenforceable. *Otis Hous.*, 165 Wn.2d at 587.

A party may waive contractual rights to arbitration. *Otis Hous.*, 165 Wn.2d at 587. "Waiver is the voluntary and intentional relinquishment of a known right." *Verbeek Props., LLC v. GreenCo Envtl., Inc.*, 159 Wn. App. 82, 87, 246 P.3d 205 (2010). A waiver may occur expressly or by implication. *Lake Wash. Sch. Dist. No. 414 v. Mobile Modules Nw., Inc.*, 28 Wn.

---

[1] Division Three of this court has held that despite some contrary authority, the trial court rather than an arbitrator should decide whether a party has waived the right to arbitration. *River House Dev. Inc. v. Integrus Architecture, P.S.*, 167 Wn. App. 221, 233-36, 272 P.3d 289 (2012). We need not address this issue because neither party here has questioned the trial court's ability to decide the waiver issue.

3

No. 44209-4-II

App. 59, 62, 621 P.2d 791 (1980). A party waives arbitration by conduct inconsistent with an intent to arbitrate. *Otis Hous.*, 165 Wn.2d at 588.

One of the ways a contractual right to arbitration may be waived is if it is not timely invoked. *Otis Hous.*, 165 Wn.2d at 587. In order to avoid a finding of waiver by conduct, a party seeking to enforce its right to arbitration must take some action to enforce that right within a reasonable time. *Otis Hous.*, 165 Wn.2d at 588. And "a party waives a right to arbitrate if it elects to litigate instead of arbitrate." *Otis Hous.*, 165 Wn.2d at 588.

Washington has a strong public policy favoring arbitration. *Heights at Issaquah Ridge Owners Ass'n v. Burton Landscape Grp., Inc.*, 148 Wn. App. 400, 405, 200 P.3d 254 (2009). Therefore, we "must indulge every presumption in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Verbeek Props.*, 159 Wn. App. at 87. Waiver is disfavored, and a party seeking to establish waiver has a heavy burden of proof. *River House Dev. Inc. v. Integrus Architecture, P.S.*, 167 Wn. App. 221, 237, 272 P.3d 289 (2012). Nevertheless, we will find waiver if the facts support such a finding. *See Ives v. Ramsden*, 142 Wn. App. 369, 383-84, 174 P.3d 1231 (2008)

2. Parkland's Waiver by Conduct

A determination of whether a party waived arbitration by conduct depends on the facts of each particular case and is not susceptible to bright line rules. *River House*, 167 Wn. App. at 237. When a party delays enforcing an arbitration clause and instead participates in litigation, the ultimate question is whether "the party's conduct ha[s] reached a point where it was inconsistent with any other intention but to forgo the right to arbitrate." *River House*, 167 Wn. App. at 238.

4

Three Washington cases involve a party's participation in litigation and delay in attempting to enforce an arbitration clause. In *River House*, the plaintiff filed suit and engaged in litigation but later requested arbitration. 167 Wn. App. at 226-28. Division Three of this court held that the plaintiff waived its right to arbitration when that party attended a status conference in person with the assigned judge, agreed to a case schedule and trial date, exchanged trial witness lists with the opposing party, participated in formal discovery and motion practice regarding discovery, and represented to the court that it was preparing for trial. *River House*, 167 Wn. App. at 238-39. The plaintiff did not request arbitration until more than 10 months after the complaint was filed, eight weeks before the discovery cutoff, and four months before trial. *River House*, 167 Wn. App. at 239.

In *Ives*, we held that a defendant waived his right to arbitration when he answered the plaintiff's complaint without mentioning arbitration, engaged in extensive discovery, deposed witnesses, submitted and answered interrogatories, and prepared fully for trial without moving to stay the action to allow the parties to arbitrate. 142 Wn. App. at 383-84. We further noted that three years and four months had elapsed since the complaint was filed and that the party seeking arbitration did not raise the issue until the day before trial. *Ives*, 142 Wn. App. at 384.

By contrast, in *Mobile Modules* the defendant's answer referred to the arbitration clause and requested a stay of court proceedings pending arbitration. 28 Wn. App. at 60. The defendant formally moved for a stay three months later. *Mobile Modules*, 28 Wn. App. at 63. Division One of this court held that there was no waiver, emphasizing that the party preserved the right to arbitrate in its answer and that the three-month delay was insufficient to establish waiver. *Mobile Modules*, 28 Wn. App. at 64.

Based on these cases, three factors demonstrate that Parkland waived its right to compel arbitration. First, in its answer Parkland did not allege that the Sailis were required to arbitrate their claims or make any reference to the arbitration provision. There is no absolute rule that a party waives a right to arbitration by not asserting that right in its initial pleading. *Verbeek Props.*, 159 Wn. App. at 89. But we found this fact significant in *Ives* when the defendant proceeded with litigation. 142 Wn. App. at 383-84. The absence of any reference to arbitration in Parkland's answer distinguishes this case from *Mobile Modules*. Parkland's failure to plead the arbitration clause coupled with its delay and participation in litigation activities reflected Parkland's intention to litigate rather than to arbitrate.

Second, Parkland participated in significant litigation activities for an extended period. These activities included submitting and answering interrogatories and requests for production, answering requests for admissions, and agreeing to a trial date. Similar activities supported a finding of waiver in *River House* and *Ives*. *River House*, 167 Wn. App. at 238-39; *Ives*, 142 Wn. App. at 383-84.

Third, Parkland's delay of seven months was longer than the three months in *Mobile Modules* and similar to the 10-month delay in *River House*. More significantly, Parkland did not move to compel arbitration until one month after the Sailis filed their summary judgment motion and just three weeks before the scheduled summary judgment hearing. A reasonable inference is that Parkland intended to litigate rather than arbitrate until changing its mind over a concern that the trial court might grant summary judgment.

Parkland nevertheless argues that it did not waive its right to arbitrate because it needed to wait until after it obtained Saili's deposition testimony in January 2012, admitting that her signatures on the agreements to arbitrate were valid. However, Parkland did not even request

No. 44209-4-II

that Saili's deposition be scheduled until December 2, 2011, almost six months after the lawsuit began. That Parkland wished to secure Saili's acknowledgment of her signature does not render reasonable its seven-month silence regarding its right to arbitration.

We hold that Parkland waived its right to compel arbitration. Accordingly, we affirm the trial court's denial of Parkland's motion to compel arbitration.[2] We consider Parkland's remaining arguments in the unpublished portion of this opinion.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

With regard to Parkland's additional arguments, we hold: (1) the retail installment sale contract under which the Sailis purchased the vehicle was void because the Sailis did not obtain financing approval, and therefore Parkland wrongfully repossessed the Sailis' Suburban as collateral for a void contract; (2) because the remedy the Sailis sought under the Retail Installment Sales of Goods and Services Act (RISA), chapter 63.14 RCW, was nullification of the contract, and because we hold that the contract was void for failure to obtain financing approval, we need not address this issue; (3) Parkland did not challenge the trial court's decision that Parkland violated the Washington Auto Dealers Practices Act (ADPA), chapter 46.70 RCW,[3] which decision we affirm; (4) because a violation of the ADPA is a per se violation of

_____

[2] Because we hold that Parkland waived its right to enforce the arbitration clause, we need not address the Sailis' arguments that the clauses were unenforceable because the retail installment contract did not contain an arbitration clause and the clauses in these other documents were unconscionable.

[3] The parties refer to this statute as the Motor Vehicle Dealers Act (MVDA). We refer to the statute as the Auto Dealers Practices Act (ADPA). The statute does not contain an official title.

7

No. 44209-4-II

the Washington Consumer Protection Act (CPA), chapter 19.86 RCW, the trial court properly concluded that Parkland violated the CPA; and (5) the Sailis presented sufficient evidence to substantiate the trial court's attorney fee award.

ADDITIONAL FACTS

At the time Saili purchased the 2003 Sonoma, the parties executed a retail installment sale contract. The parties also executed two additional agreements providing that the validity of the retail installment sale contract was conditioned upon Saili obtaining financing for the purchase. A document titled "Condition of Financing" stated, "As provided for in the attached Retail Installment Sales Contract, this sale transaction is expressly conditioned on approval of Buyer's financing or creditworthiness. IF THIS CONDITION IS NOT MET, THE CONTRACT IS VOID, EXCEPT AS PROVIDED FOR IN ANY ATTACHED SALES CONTRACT DOCUMENTS."[4]  Clerk's Papers (CP) at 3 (boldface omitted). A second document titled "Vehicle Buyers Order" stated:

> If Buyer is buying the vehicle in a credit sale transaction with Dealer evidenced by a signed retail sale contract, this Agreement is binding when the retail installment sale contract is signed, but will not remain binding if a third party finance source does not agree to purchase the retail installment sale contract executed by Buyer and Dealer based on this agreement.

CP at 48.

As additional collateral for the purchase of the Sonoma, Saili agreed to give Parkland a security interest in a 2002 Chevrolet Suburban that she owned with her husband, Fa Ala A Saili. She authorized Parkland to pay off the existing balance owed on the Suburban to permit the

---

[4] This document is not in the record before us. The quotation is from the complaint. The parties do not dispute that this document existed or that the language quoted in the complaint is accurate.

transfer of its title from the lienholder, Buy Rite Auto Sales, to Parkland. On May 26, Parkland obtained a new certificate of title naming Parkland as both the registered and legal owner of the Suburban.

Saili submitted a credit application to Reliable Credit Association Inc. to finance the remainder of the purchase price. Reliable Credit denied her application in a letter dated May 17. Saili had tendered a check to Parkland for the $500 promissory note on May 18, but after discovering that her financing application was denied she withdrew the funds she held on deposit for that payment. Therefore, when Parkland cashed the check, it was dishonored for insufficient funds. As a result, on May 31, Parkland had the Sonoma and the Suburban towed from the Sailis' residence to Parkland's place of business.

After Parkland repossessed the vehicles, Saili went to the dealership and asked Lonn Ostrem, Parkland's president, if they could reach an agreement under which she could have the vehicles returned to her. Ostrem told Saili that if she could obtain financing to pay off the remaining $500 on the down payment, he would return the vehicles. To assist with that effort, Ostrem prepared a second promissory note for $500 due June 20. However, because Saili did not seek financing for the remainder of the down payment, Parkland did not return the vehicles.

Saili did tender a $500 payment the date Parkland repossessed the vehicles. However, the parties dispute the purpose and recipient of that payment. Ostrem testified that she paid $500 in repossession fees directly to the person with whom Parkland contracted to have the vehicles repossessed. Saili claimed that when she went to the dealership on May 31, she was told that if she paid $500 to a man named "Ronny," she would be able to drive one of the vehicles home. CP at 141-42. She claimed that she paid Ronny $500, but instead of being given back one of the vehicles, Parkland loaned her a different vehicle.

9

On June 10, Saili and her husband filed a complaint against Parkland seeking damages and an order requiring Parkland to return the Suburban. They claimed that Parkland wrongfully repossessed the Suburban because Saili's credit rejection voided the retail installment sale contract. The Sailis further claimed that Parkland violated the RISA, the ADPA, and the CPA. They also requested attorney fees.

On December 20, the Sailis moved for summary judgment, asking the trial court to find that Parkland violated the RISA, the ADPA, and the CPA. They also claimed that Parkland was liable for conversion of the Suburban. The Sailis argued that the retail installment sale contract violated the RISA because the entire agreement, including the certificate giving Parkland a security interest in the Suburban, was not contained in a single document as required by RCW 63.14.020. They also argued that Parkland violated the ADPA, RCW 46.70.180(1), which prohibits a motor vehicle dealer from printing or publishing any statement with regard to the sale or financing of a vehicle that is false, deceptive, or misleading.

On February 10, 2012, the trial court granted the Sailis' summary judgment motion on their RISA and conversion claims. In its oral ruling, the trial court stated that Parkland violated the RISA because the retail installment sale contract did not reference the granting of a security interest in the Suburban or the right to repossess the Suburban. With regard to conversion, the trial court found (1) no legal basis in the promissory notes for repossessing the Suburban, (2) that the sale contract became void once Saili's financing and credit worthiness was rejected, and (3) thereafter Parkland had no basis for repossession. However, the trial court denied summary judgment on the ADPA and CPA claims. In its oral ruling the court stated that RCW 46.70.180(1) requires some distribution or dissemination of information that violated the statute,

10

and it found that Parkland made no such distribution or dissemination. The trial court did not mention the CPA in its oral ruling.

The Sailis moved for reconsideration of the trial court's summary judgment order, asking the court to rule that Parkland violated the CPA and requesting an order requiring Parkland to return the Suburban to the Sailis. The Sailis argued that even if Parkland did not violate the terms of RCW 46.70.180(1), the trial court could find a general violation of RCW 46.70.180 on the authority of *Sherwood v. Bellevue Dodge, Inc.*, 35 Wn. App. 741, 669 P.2d 1258 (1983). Parkland also moved for reconsideration on the RISA and conversion claims.

On March 2, the trial court granted the Sailis' motion for reconsideration and ordered Parkland to return the Suburban. In its oral ruling, the trial court noted that in the Sailis' motion for reconsideration they referenced RCW 46.70.310, which states that any violation of that chapter also is a violation of the CPA. Therefore, the trial court concluded, the Sailis could proceed on their CPA claim and set the issue for trial on damages.[5] The trial court denied Parkland's motion for reconsideration.

After trial on damages, the trial court entered conclusions of law regarding its summary judgment rulings on liability. The trial court concluded that Parkland violated both the RISA and the ADPA because the retail installment sale contract did not (1) identify the Suburban as collateral for the Sonoma purchase, (2) contain any security agreement for the Suburban, (3) disclose that Parkland would obtain registered and legal ownership of the Suburban, or (4)

---

[5] Although the trial court did not expressly state in its oral ruling that Parkland violated the ADPA, we presume that the trial court concluded that there was an ADPA violation because it premised its decision that there was a CPA violation on a violation of the ADPA under RCW 46.70.310.

No. 44209-4-II

disclose that default on the promissory note would permit Parkland to take possession of the Suburban.

Parkland returned the Suburban to Saili on March 13, 2012. Saili's personal effects were returned to her along with the vehicle, but a global positioning system (GPS) device was missing from those items. Parkland returned the Suburban in poor condition, and Saili stated that she spent $50 in cleaning supplies to clean the vehicle. Saili did not rent another vehicle during the time she was without the Suburban, but she testified that it was an inconvenience and that she had to rely on others to borrow vehicles to transport her family, including her five children.

On October 1, 2012, after a trial limited to the amount of damages, the trial court awarded actual damages for the loss of the GPS equipment, the cost of cleaning supplies, and the loss of use of the Suburban. The trial court trebled those damages under the CPA. It also awarded the Sailis $500 for the initial down payment on the Sonoma because the contract was void. The trial court awarded the Sailis an additional $500 for the payment Saili made on May 31, 2011, the date Parkland repossessed the vehicles.[6] Finally, the trial court awarded the Sailis attorney fees under RCW 4.84.330, RCW 19.86.090, and RCW 46.70.190.

Parkland appeals the trial court's summary judgment order, order on the parties' motions for reconsideration, judgment awarding damages to the Sailis, and order awarding attorney fees to the Sailis.

ANALYSIS

A.    SUMMARY JUDGMENT ON LIABILITY

_____

[6] The trial court apparently believed that Saili had made the payment to Parkland, not directly to the entity that repossessed the vehicles on Parkland's behalf.

12

The trial court's summary judgment and reconsideration orders imposing liability on Parkland and requiring Parkland to return the Suburban were based on multiple legal theories. First, the trial court concluded that the retail installment sale contract violated the RISA because the security agreement for the Suburban was not contained in the same agreement as the installment contract. Therefore, the trial court concluded, Parkland had no lawful authority to repossess the Suburban and its repossession amounted to conversion. Second, the trial court concluded that Parkland violated the ADPA because information regarding the vehicle's financing and the existence of a security interest in the Suburban were not contained in the same document. Finally, the trial court concluded that Parkland violated the CPA because a violation of the ADPA was a per se violation of the CPA.

Parkland challenges all of these conclusions except for the trial court's conclusion that Parkland violated the ADPA. We hold that the agreement was void because Saili's financing application was rejected. Therefore, we need not address Parkland's argument that the contract was not void under the RISA. And because Parkland does not challenge the ADPA violation and an ADPA violation is a per se violation of the CPA, the trial court did not err when it concluded that Parkland violated the CPA. Parkland fails to properly challenge the trial court's ruling that Parkland converted the Suburban. Accordingly, we affirm the trial court's rulings.

1.   Standard of Review

We review a trial court's order granting summary judgment de novo. *Loeffelholz v. Univ. of Wash.*, 175 Wn.2d 264, 271, 285 P.3d 854 (2012). Summary judgment is appropriate where, viewing the evidence in the light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Loeffelholz*, 175 Wn.2d at 271. "A genuine issue of material fact exists where reasonable minds

13

No. 44209-4-II

could differ on the facts controlling the outcome of the litigation." *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). If reasonable minds can reach only one conclusion on an issue of fact, that issue may be determined on summary judgment. *M.A. Mortenson Co. v. Timberline Software Corp.*, 140 Wn.2d 568, 579, 998 P.2d 305 (2000).

### 2. Conversion

The trial court granted summary judgment on Parkland's conversion of the Suburban.[7] Parkland's only argument on appeal is that it had obtained ownership of the Suburban pursuant to its agreement with the Sailis, and "you can't 'convert' that to which you have lawful title." Br. of Appellant at 12. However, Parkland's repossession of the Suburban constituted a conversion because Saili's credit rejection voided the sale contract and eliminated any possessory right to the Suburban that Parkland may have had.

Conversion is the "willful interference with another's property without lawful justification, resulting in the deprivation of the owner's right to possession." *Lowe v. Rowe*, 173 Wn. App 253, 263, 294 P.3d 6 (2012), *review denied*, 177 Wn.2d 1018 (2013). A wrongful repossession of a vehicle can constitute a conversion. *Sherwood*, 35 Wn. App. at 746 (because vehicle dealer did not have perfected security interest in vehicle or contractual right to repossess it, vehicle dealer's repossession of buyer's vehicle was unlawful conversion).

Here, the parties executed two documents signed on the same date as the retail installment sale contract in which they agreed that the validity of the contract was conditioned upon Saili obtaining financing for the purchase. In a letter dated May 17, 2011, Reliable Credit

---

[7] The Sailis did not plead conversion in their complaint. But the trial court considered this claim on summary judgment and on appeal Parkland does not object to our consideration of this claim.

14

denied Saili's financing application. Therefore, by the terms of these agreements, the sale contract became void as of May 17.

Parkland argues that there was a genuine issue of material fact regarding whether the condition to obtain financing was met. In support of this argument, Parkland relies on a declaration by Ostrem, in which he stated:

> When Ms. Saili's retail installment sales contract was sent to Reliable Credit, the manager there called me on May 11, 2011 and told me that her credit history was insufficient unless I wanted to give an unconditional guaranty. I maintain a "book of business" with Reliable Credit where Reliable Credit agrees to purchase any loan that I send to them if I unconditionally guaranty the performance of that loan. I agreed to transfer the loan to my "book of business" and unconditionally guaranty the loan. It is my understanding that Reliable Credit sent a declination letter to Ms. Saili by mistake on May 17, 2011 as I had already agreed to place the loan in my "book of business" with Reliable Credit. There was no decline of the terms and conditions of Ms. Saili's loan by Reliable Credit, only the requirement that I unconditionally guaranty the loan, which I did.

CP at 109.

This declaration is insufficient to create a question of material fact because Parkland provided no evidence that Reliable Credit ever rescinded its denial of credit to Saili or admitted that it denied credit in error. Ostrem may have had an "understanding" that the declination letter was sent by mistake. But the record contains no indication that the Sailis received any notice that Reliable Credit was rescinding its rejection. Similarly, Ostrem's testimony that he subsequently guaranteed the loan is not sufficient to create a question of fact on whether credit was denied because nobody communicated any change in the financing status to the Sailis. The record shows only that Saili's financing application was rejected and that rejection was never rescinded.

Parkland also argues that it could not be held liable for conversion because it held title to the Suburban pursuant to its agreement with the Sailis. However, once the sale contract became

15

void, Parkland's right to obtain title to the Suburban also became void. Further, Parkland cites no authority for its argument that no conversion could occur under these circumstances. Therefore, we need not consider it further.

Because the denial of credit operated to void the sale contract, Parkland no longer had a legitimate claim of an interest in the Suburban as collateral for that contract. As a result, we hold that there was no lawful justification for Parkland's repossession of the Suburban and that the repossession constituted a conversion.

3.    RISA Violation

The trial court concluded that Parkland violated RCW 63.14.020 because the retail installment sale contract did not contain all of the parties' agreements, including the agreement to use the Suburban as collateral for the sale. Parkland does not contest this conclusion. Instead, it argues that the contract at issue here was exempt from the requirements of the RISA under RCW 63.14.151 because it complied with the disclosure requirements in the federal truth in lending act. However, Parkland provides no argument on whether the requirements of RCW 63.14.020 constitute "disclosure requirements" referenced in RCW 63.14.151. Nor does Parkland explain how the contract at issue here complies with the truth in lending act requirements. Rather, Parkland simply states without citation to the record that "[i]t is not disputed that the Retail Installment Sales Contract executed by the Sailis complied with those disclosure requirements." Br. of Appellant at 10. We decline to address this argument because Parkland does not support it with sufficient argument or citation to the record as required in RAP 10.3(a)(6).

Parkland also argues that the consequence of a RISA violation is not nullification of the contract or negation of the security interest but simply the denial of the right to enforce certain

collection costs under RCW 63.14.180. However, as discussed above, we hold that the rejection of financing voided the sales contract and eliminated Parkland's security interest. Therefore, whether the RISA violation also compels the same result is immaterial.[8]

4. ADPA Violation

Parkland argues that the trial court erred when it concluded that the alleged ADPA violation was a per se violation of the CPA. However, on appeal Parkland does not challenge the trial court's ruling that Parkland violated the ADPA. Instead, Parkland argues only that a "wrongful repossession" does not constitute a per se violation of the CPA despite the contrary holding of *Sherwood v. Bellevue Dodge, Inc.*, 35 Wn. App. 741, 669 P.2d 1258 (1983). Because Parkland does not make any argument that the trial court erred in finding a ADPA violation, we affirm the trial court's ruling on this issue.

In their summary judgment motion, the Sailis argued that Parkland violated the ADPA, RCW 46.70.180. They based their argument on the fact that in addition to the promissory note requiring payment on May 18, 2011, the Sailis signed a second promissory note that did not require payment until June 20. They argued that Parkland violated RCW 46.70.180(1), which prohibits a motor vehicle dealer from publishing any statement that is false, deceptive or misleading, because the second promissory note gave the false impression that Parkland would

---

[8] We note that RCW 63.14.180 limits the available remedies for a RISA violation, allowing sellers to recover the cash price of the goods but not service charges or collection fees. There is no provision in the RISA allowing for nullification of the contract if the seller fails to comply with the RISA's disclosure requirements in RCW 63.14.020. Further, there is no private cause of action under the RISA allowing buyers to recover damages. *Cazzanigi v. Gen. Elec. Credit Corp.*, 132 Wn.2d 433, 450, 938 P.2d 819 (1997). Therefore, the Sailis cannot recover damages for the alleged RISA violation. The trial court concluded that the RISA invalidated the security agreement, but did not explicitly state that it was awarding damages under the RISA. Accordingly, insofar as the trial court based any of its damages award on a RISA violation, it was incorrect. Nevertheless, any error was harmless because all of the damages awarded here were authorized by the CPA based on Parkland's violation of the ADPA.

accept payment on the note on or before June 20. The trial court initially rejected the Sailis' ADPA arguments, concluding that RCW 46.70.180(1) "clearly does require that the information be distributed or disseminated in some manner, and I don't believe that this could be that type of a thing." CP at 487.

In their motion for reconsideration, the Sailis argued that Parkland converted the Suburban, and therefore under *Sherwood* Parkland violated RCW 46.70.180. In *Sherwood*, Division One of this court held that an unsecured vehicle dealer's non-judicial repossession of a vehicle was an unlawful act or practice in the sale of motor vehicles under RCW 46.70.180, although it was not a practice specifically enumerated in the statute. 35 Wn. App. at 747. The court in turn held that "an unsecured party's non-judicial repossession of a motor vehicle affects the public interest, per se" and therefore established the public interest element of a CPA action. *Sherwood*, 35 Wn. App. at 747. Relying on *Sherwood*, the Sailis argued that Parkland violated the ADPA because Parkland converted the Suburban.

The trial court granted the Sailis' motion for reconsideration, concluding that because RCW 46.70.310 states that any violation of the chapter is a violation of the CPA, the trial court would set the CPA matter for a trial on damages. Although the trial court did not explain its decision on the issue, the trial court does not appear to have based its decision on the conversion issue as stated in *Sherwood*. Rather, the trial court's post-trial conclusions of law state that Parkland violated RCW 46.70.180(1)(b), which provides that it is unlawful for a vehicle dealer to print or publish that a certain percentage of a vehicle's sale price may be financed when such financing is not offered in a single document evidencing the entire transaction. The trial court concluded that the retail installment sale contract did not comply with RCW 46.70.180(1)(b)

18

because it did not reference the method of financing, the requirement for credit approval, or the existence of the Suburban as collateral. CP at 372.[9]

Parkland mentions the *Sherwood* case in its argument regarding the CPA. However, Parkland appears to argue only that the trial court's reliance on *Sherwood* was incorrect for the purposes of concluding that there was a per se CPA violation premised on the alleged ADPA violation. It does not argue that the trial court incorrectly decided that there was an ADPA violation. Moreover, even assuming Parkland intended to address the ADPA in its discussion of *Sherwood*, it fails to address the ground on which the trial court ultimately concluded that there was an ADPA violation – failure to comply with RCW 46.70.180(1)(b). Because Parkland does not challenge the trial court's ruling that it violated that ADPA, we affirm on this issue. RAP 10.3(a)(6).

5.   Per Se CPA Violation

Parkland challenges the trial court's finding of a per se violation of the CPA. Br. of Appellant at 5, 13. "Whether an action gives rise to a CPA violation is a question of law that we review de novo." *Bavand v. OneWest Bank, FSB*, 176 Wn. App. 475, 503-04, 309 P.3d 636 (2013).

Under Washington's CPA, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful." RCW 19.86.020. Any person injured in his or her business or property by a CPA violation may bring a civil suit for

---

[9] Although findings of fact and conclusions of law generally are superfluous on review of summary judgment, we can consider findings and conclusions in determining what issues the trial court addressed. *Cf. Banuelos v. TSA Wash., Inc.*, 134 Wn. App. 603, 614, 141 P.3d 652 (2006) (disregarding trial court's summary judgment findings except for legal reasoning and conclusions).

injunctive relief, damages, attorney fees and costs, and treble damages. RCW 19.86.090. To prevail on a CPA claim, the plaintiff must show " '(1) [an] unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation.' " *Bain v. Metro. Mortg. Grp., Inc.*, 175 Wn.2d 83, 115, 285 P.3d 34 (2012) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986)).

In *Hangman Ridge*, our Supreme Court discussed ways in which the first three elements of a CPA claim can be established per se. 105 Wn.2d at 786-91. The court held that the first two elements may be satisfied by showing that the alleged act is a per se unfair trade practice, which "exists when a statute which has been declared by the Legislature to constitute an unfair or deceptive act in trade or commerce has been violated." *Hangman Ridge*, 105 Wn.2d at 786. Similarly, the third element may be satisfied by showing that there was a per se public interest impact. *Hangman Ridge*, 105 Wn.2d at 789. This can be established by showing that there has been a violation of a statute that contains a specific legislative declaration of public interest impact. *Hangman Ridge*, 105 Wn.2d at 791.

The basis for the CPA claim here was a violation of the ADPA, chapter 46.70 RCW. That chapter contains two provisions that together satisfy the first three elements of a CPA claim per se. First, shortly after *Hangman Ridge* was decided, the legislature added RCW 46.70.310 to the ADPA, which provides, "Any violation of this chapter is deemed to affect the public interest and constitutes a violation of chapter 19.86 RCW." This is a specific legislative declaration satisfying the first two elements of a CPA claim. *Banuelos v. TSA Wash., Inc.*, 134 Wn. App. 603, 614, 141 P.3d 652 (2006).

Second, RCW 46.70.005 provides:

The legislature finds and declares that the distribution, sale, and lease of vehicles in the state of Washington vitally affects the general economy of the state and the public interest and the public welfare, and that in order to promote the public interest and the public welfare, and in the exercise of its police power, it is necessary to regulate and license vehicle manufacturers, distributors, or wholesalers and factory or distributor representatives, and to regulate and license dealers of vehicles doing business in Washington, in order to prevent frauds, impositions, and other abuses upon its citizens and to protect and preserve the investments and properties of the citizens of this state.

The *Hangman Ridge* court explicitly stated that this provision was a specific legislative declaration of public interest impact. 105 Wn.2d at 791.

Nevertheless, Parkland argues that the trial court incorrectly relied on *Sherwood* when it determined that Parkland violated the CPA. The court in *Sherwood* held that a motor vehicle dealer's unlawful repossession of a vehicle was a violation of chapter 46.70 RCW, which in turn established the CPA's public interest impact element per se. 35 Wn. App. at 747. Parkland argues that *Sherwood* was incorrectly decided because "[t]he Court in *Sherwood* sought to bootstrap repossession issues into RCW 46.70." Br. of Appellant at 14. Parkland argues that such a determination was inappropriate under *Hangman Ridge*, which explicitly prohibits judicial determinations of when the public interest requirement has been established per se. However, because we affirm the trial court's ruling that Parkland violated the ADPA, we need not address the applicability of *Sherwood* here. The plain language of RCW 46.70.310 and RCW 46.70.005 shows that a violation of the ADPA establishes per se the first three elements of a CPA claim.

We hold that Parkland's ADPA violation established the first three elements of the test for a CPA claim. As to the remaining two elements, the trial court concluded that Parkland's repossession of the Suburban proximately caused damages to the Sailis, and Parkland does not

challenge these conclusions. Accordingly, we hold that Parkland's challenge to the trial court's ruling that it violated the CPA decision fails.

B.    ATTORNEY FEES IN TRIAL COURT

Parkland argues that even if there was a CPA violation, the trial court abused its discretion when it awarded attorney fees under the CPA because the amount of the award was not based on a fee affidavit. We disagree.

We review a trial court's attorney fee award for a manifest abuse of discretion. *Collins v. Clark County Fire Dist. No. 5*, 155 Wn. App. 48, 98, 231 P.3d 1211 (2010). We reverse an award only if the trial court exercised its discretion on untenable grounds or for untenable reasons. *Collins*, 155 Wn. App. at 98. In order for the trial court to properly calculate an attorney fee award,

> the attorneys must provide reasonable documentation of the work performed. This documentation need not be exhaustive or in minute detail, but must inform the court, in addition to the number of hours worked, of the type of work performed and the category of attorney who performed the work (*i.e.*, senior partner, associate, etc.).

*Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983).

Here, the Sailis' attorney submitted a detailed statement with the Sailis' trial brief listing by date all legal services performed, the time devoted to each activity, and the charges allocated to legal services performed on each date. The trial court stated in its order awarding attorney fees that it considered this document when determining the award amount. Although it might be the better practice, there is no requirement that the reasonable documentation necessary for an attorney fees award be submitted in the form of an affidavit or declaration. The authority Parkland cites is inapposite.

The Sailis' attorney submitted sufficient documentation to inform the trial court of the legal services performed and the charges for those services, and the trial court accepted this documentation even though it was not provided in affidavit or declaration form. Accordingly, we affirm the attorney fees award.

C.    ATTORNEY FEES ON APPEAL

The Sailis request an award of attorney fees on appeal under RCW 19.86.090 (CPA), RCW 4.84.330 (contractual provision) and RCW 46.70.190 (ADPA). As a preliminary matter, Parkland argues that the Sailis waived their right to request fees under the contract and the ADPA because they did not raise the argument below. In their trial memorandum, the Sailis requested attorney fees only under the CPA. However, after trial but before the hearing on fees, the plaintiffs' attorney submitted a statement requesting fees under the three theories the Sailis now argue on appeal. The trial court awarded fees based on all three theories. Because the Sailis raised the three theories before the trial court and the trial court considered them, we consider them on appeal.

RCW 19.86.090 provides that any person who is injured in his or her business or property by a violation of RCW 19.86.020 is entitled to recover reasonable attorney fees. Because we hold that the Sailis suffered actual damages resulting from Parkland's violation of RCW 19.86.020, we hold that the Sailis are entitled to an award of attorney fees on appeal under the CPA.

RCW 4.84.330 provides that the prevailing party in an action to enforce a contract that specifically provides for attorney fees may recover those fees. Because there is no valid contract here, we deny the request for fees on this basis. *See Bartlett v. Betlach*, 136 Wn. App. 8, 17, 146 P.3d 1235 (2006).

23

No. 44209-4-II

RCW 46.70.190 allows any person injured in his or her business or property by a violation of the ADPA to recover reasonable attorney fees. Parkland argues that no attorney fees are available to the Sailis because the statute refers to businesses, not individuals, and because the trial court did not make a finding that the Sailis were "injured [in their] business or property." Reply Br. of Appellant at 19. But because the conditions for awarding attorney fees are the same as for awarding damages under the statute, and because Parkland below did not make these arguments challenging the trial court's decision on ADPA liability, we decline to address Parkland's argument. We award attorney fees on appeal under the ADPA.

We affirm on all issues and award the Sailis attorney fees on appeal.

MAXA, J.

We concur:

HUNT, J.

P/ORGF/ J.

24